In re Mary Joan LUMBAR, f/k/a Mary Joan Welsh, f/k/a Mary Joan LaFond, Debtor.

Patti J. Sullivan, Trustee, Plaintiff,

v.

Raymond J. Welsh, Joan C. Welsh, The Welsh Living Trust, and Raymond J. Welsh and Joan C. Welsh, Trustees, Defendants.

Bankruptcy No. 08–36803.
Adversary No. 09–3093.

United States Bankruptcy Court, D. Minnesota.

March 3, 2011.

Andrea M. Hauser, Leonard, O'Brien, Spencer, Gale & Sayre, Minneapolis, MN, for Plaintiff.

Alan E. Brown, Larkin Hoffman Daly & lindgren Ltd., Bloomington, MN, for Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' RESPONSIVE REQUEST FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came before the Court on the Plaintiff's motion for summary judgment and on the Defendants' responsive request for summary judgment. The Plaintiff appeared by her attorney, Andrea M. Hauser. The Defendants appeared by their attorneys, Thomas J. Flynn and Julie N. Nagorski. The following decision is based on the written record submitted for the motion, and on counsel's written and oral argument.

### THE PARTIES

The Debtor is a resident of Ramsey County, Minnesota. She filed a voluntary petition for bankruptcy relief under Chapter 7 on December 24, 2008.

The Plaintiff is the Trustee of the Debtor's bankruptcy estate.

The individual Defendants ("the Welshes") are the Debtor's parents. Defendant The Welsh Living Trust was formed by the Welshes.

### NATURE OF ADVERSARY PROCEEDING

The subject of this adversary proceeding is real estate located at 1866 Wellesley Avenue in St. Paul, Minnesota. The Plaintiff pleads the following facts in relation to that real estate. In October, 1994, the Welshes and the Debtor and her then-husband, Daniel Lumbar, entered a contract for deed for the sale of the property. The Welshes were the sellers and the Lumbars were the purchasers. Eleven years later, there was a rapid succession of legal proceedings: the Lumbars went through a proceeding for the dissolution of their marriage; the Welshes undertook to cancel the contract for deed; the Lumbars and the Welshes were embroiled in litigation in the Ramsey County District Court over the property; they entered into a settlement of that litigation; various instruments relating to the title of the property were executed, including a quit claim deed from the Debtor to the Welshes; and some, but not all, of those documents were filed in the land records for Ramsey County.

In her complaint, the Plaintiff seeks to undo the ultimate disposition of the Debtor's interest in the real estate, and to recover that interest or its value. She challenges the various component transactions under six separate counts of her complaint:

1. In Count I, she seeks a declaratory judgment that the Welshes' cancellation of the contract for deed was ineffective under Minnesota law.

2. In Count II, she seeks to avoid the transfer under the quit claim deed pursuant to 11 U.S.C. § 548(a)(1)(B), i.e., as a constructively-fraudulent transfer.

3. In Count III, she seeks to avoid the same transfer pursuant to 11 U.S.C. § 548(a)(1)(A), i.e., as a transfer made with actual intent to hinder, delay, or defraud the Debtor's creditors.

4. In Count IV, she seeks to avoid the same transfer as a constructively-fraudulent transfer under Minn.Stat. §§ 513.44 and 513.45, applied pursuant to 11 U.S.C. § 544.

5. In Count V, she seeks to avoid the same transfer as ineffective due to

lack of perfection, invoking 11 U.S.C. § 544(a).

6. In Count VI, she characterizes the ultimate disposition of the property as an unjust enrichment of the Welshes, and she seeks an award of damages against them.

To support these theories, the Plaintiff recites a long, involved series of fact averments, largely transactional and documentary in nature.

In their answer, the Defendants admit many of the fact averments. (Most of the admitted facts would be based on objectively-memorialized, documentary evidence anyway.) They deny the remainder, particularly those that are inferential and that would characterize the acts of the Debtor and the Welshes as subjectively fraudulent. They plead a handful of affirmative defenses: the Plaintiff's failure to state a claim on which relief could be granted, and the time-worn "equitable defenses of laches, estoppel, and waiver." They assert the effectiveness of their cancellation of the contract for deed as a defense. They argue that avoidance remedies under fraudulent transfer law do not apply to an effective cancellation of a contract for deed. Finally, they plead that the Debtor "received reasonably equivalent value in return," to "the extent that the Debtor transferred anything of value" in the real estate to them.

## MOTIONS AT BAR

The Plaintiff requested summary judgment via a formal motion. The target of the motion is the second of the potential transfers identified in her complaint—the one that would have been effected via the quit claim deed from the Debtor to the Welshes, which was given as part of the settlement of the state-court litigation. The Plaintiff sought judgment, as a matter of law, on Counts II–V of her complaint—

i.e., the avoidance or nullification of any transfer to the Defendants that was made when the Debtor gave the deed.

To support the motion, the Plaintiff submitted a body of evidence, mostly documentary in nature. This, she argued, made out a prima facie case under those counts, for avoidance of a transfer of an interest in real estate as a constructively-fraudulent transfer under provisions of the Bankruptcy Code and Minnesota's fraudulent transfer law. She also sought avoidance as an actually-fraudulent transfer under the Bankruptcy Code, using a "badges of fraud" analysis. In the alternative, she argued, the transfer had to be deemed ineffective against her under Minnesota law, in her status as a hypothetical bona fide purchaser under 11 U.S.C. § 544(a).

As the Plaintiff would have it, the granting of any of these expedients would entitle her to recover the value of an undivided one-half interest in the equity in the real estate, measured as of the date of the deed. The recovery would be effected by a money judgment against the Defendants pursuant to 11 U.S.C. § 550(a). She maintained that the amount of that value could be readily liquidated on the record she made.

The unspoken postulate of the Plaintiff's motion was that her evidence was uncontroverted. If that were the case, a grant of summary judgment would be mandated, if the governing law entitled the Plaintiff to relief on the facts thus established. Fed.R.Civ.P. 56(a), *as incorporated by* Fed. R. Bankr.P. 7056 ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

The Welshes did not make a formal motion for summary judgment in their favor. In their response to the Plaintiff's

motion, they argued that she was not entitled to summary judgment. They put forth alternate bases for that position: there were genuine issues of material fact as to one or more of the elements the Plaintiff had to prove; or, legal relief was not available to the Plaintiff under a sequence of events that could be conceded to her as matters of fact. They requested that they be granted summary judgment, were the latter analysis accepted.

The Welshes' request is not presented by motion in the strictest technical sense. However, the Plaintiff and her counsel do not complain of inadequate notice or an inability to respond.[1] Thus, a grant of summary judgment for the defense can still be considered and made if the record merits that outcome. *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Figg v. Russell,* 433 F.3d 593, 597 (8th Cir.2006); *Bendet v. Sandoz Pharm. Corp.,* 308 F.3d 907, 912 (8th Cir.2002); *Shur–Value Stamps, Inc. v. Phillips Petroleum Co.,* 50 F.3d 592, 595 (8th Cir.1995); *Interco Inc. v. Nat'l Surety Corp.,* 900 F.2d 1264, 1268–1269 (8th Cir. 1990).

## UNDISPUTED FACTS

The parties present a welter of issues, but they do not agree as to their logical sequence. The best way to sort this out is to identify the historical and transactional facts that are uncontroverted. They are as follows:

1. The Debtor and Daniel Lumbar were married on October 1, 1994.

2. On October 28, 1994, the Lumbars, as purchasers, entered a contract for deed with the Welshes, as sellers, for the real estate at 1866 Wellesley Avenue in St. Paul, Minnesota.

3. The total purchase price under the contract for deed was $150,000.00. After the crediting of a down payment of $7,500.00, the balance was to be paid with 7% interest. The debt was amortized via monthly payments of $750.00; an interim lump-sum payment of $22,500.00 due on April 1, 1996; and the remaining balance due in full on October 1, 2001.

4. The contract for deed was recorded in the Ramsey County land records on November 7, 1994.

5. In February, 2000 the Welshes conveyed their sellers' interest in the contract for deed to "Raymond J. Welsh and Joan C. Welsh, Trustees, or their successors in trust, under the Welsh Living Trust." This deed was recorded on April 10, 2000.

6. The Lumbars made the monthly payments on an ongoing basis. They did not make the interim lump-sum payment due in 1996, or the final balloon payment due in 2001.

7. The Welshes did not undertake to cancel the contract for deed on either of the defaults on the lump-sum payments. In January, 2002, the Lumbars began making monthly payments of $1,000.00. The Welshes accepted these payments as they were made.

8. In February, 2006, Daniel Lumbar commenced proceedings for the dissolution of the Lumbars' marriage, in the Hennepin County, Minnesota District Court.

9. On May 1, 2006, the Welshes served a notice of cancellation of contract for deed on the Lumbars. In the notice, the Welshes asserted that the amount due was $188,426.15, payment of which would be necessary to avoid the cancellation. The notice of cancellation specified a sixty-day cure period.

---

1. There would have been no basis for a complaint of inadequate notice. The Plaintiff and her counsel submitted a detailed reply brief after the Defendants filed their response.

10. In mid-May, 2006, Daniel Lumbar's attorney requested that the Debtor join in an action to stay the cancellation of contract for deed. Within two days, the Debtor's attorney declined to do so.

11. On June 8, 2006, Daniel Lumbar filed documents in the Ramsey County, Minnesota District Court, presenting a motion for a temporary injunction against the Welshes. He requested equitable relief to toll or defer the cancellation of the contract for deed. The documents bore a caption that named himself as the plaintiff and the Welshes and the Debtor as defendants. However, Daniel Lumbar did not file a complaint with the motion. His motion was heard on June 22, 2006. He had not filed a complaint by that date either.

12. The June 22 hearing was a long and contentious session of legal argument, without the taking of evidence. The state-court judge repeatedly took the Welshes' attorney to task for the perceived inequity of his clients' actions in seeking to divest Daniel Lumbar of the value of his interest in the property. He was especially concerned with two things: the Welshes were seeking to extinguish the purchasers' interest under the contract for deed, before the full (and apparently substantial) value of the equity could be divided in the Lumbars' dissolution proceeding; and the sequence of circumstances suggested collusion between the Welshes and their daughter, the Debtor. Daniel Lumbar's attorney insisted that his client wanted to pay off the full balance of the contract for deed per the notice of cancellation. He repeatedly stated that his client was seeking financing to fund that, but had been stymied by interference from the Welshes; and, he maintained, his client needed additional time to deal with that.[2] At the conclusion of the hearing, the judge took the motion under advisement.

13. In an order and memorandum entered on June 27, 2006, the state court granted a temporary injunction against all of the named defendants, "against further proceedings to effectuate the termination of the contract for deed...." It ordered the escrow of deeds from the Welshes and the Welsh Trust to the Lumbars, pending the closing on a loan to Daniel Lumbar (identified specifically by a numbered "Title Commitment"), and the payment to the Welshes of the full cure amount per the notice of cancellation. It also mandated the Debtor's cooperation in the loan closing, via the execution of all documents necessary to get the loan closed. (The order specified that the Debtor would not be required to assume any personal liability to the lender in connection with the loan.) The injunction was "to expire no later than July 31, 2006 or upon confirmation that Daniel Lumbar [did] not qualify for a loan" in the amount necessary for the cure.

14. After the hearing, the Welshes executed and escrowed the deeds. Daniel Lumbar was approved for a loan, in an amount more than enough to make cure pursuant to the notice of cancellation. He arranged for a closing to occur on July 7, 2006. Despite the mandate of the temporary injunction, Mary Lumbar did not attend the closing. She never executed the documents required of her.

15. On July 17, 2006, Daniel Lumbar filed a complaint in the Ramsey County District Court, which was lodged in the same-numbered court file as the earlier motion for temporary injunction and the

**2.** The interference was identified as a communication from the Welshes to the title company that would handle the closing, to the effect that they had further claims against the Lumbars on an unsecured loan they had made to them several years earlier to pay for major improvements to the house on the property.

order thereon. He again named the Welshes and the Debtor as defendants. He pleaded claims for unjust enrichment, civil conspiracy, fraud and misrepresentation, and other torts. As relief, he sought a continuing suspension of the cancellation, and other injunctive relief to preserve his interest in the real estate.

16. In the meantime, the Welshes had taken an appeal from the order for temporary injunction. They also filed a motion in the Ramsey County District Court, seeking to have the temporary injunction dissolved or stayed. Daniel Lumbar filed a motion to have the Debtor held in contempt for her failure to enable the loan closing.

17. The two motions were heard in the Ramsey County District Court on July 17, 2006. After a lengthy (though less contentious) hearing, the state-court judge issued an order on July 25, 2006. He declined to dissolve the temporary injunction, but he stayed it pending entry of decision by the Minnesota Court of Appeals in the Welshes' appeal. The stay was conditioned on the Debtor's execution of all documents that had been required of her for the loan closing, and their escrow. The contempt motion against the Debtor was denied, without prejudice to a renewal were she to fail to execute the closing documents thenceforth.

18. On May 29, 2007, the Minnesota Court of Appeals reversed the Ramsey County District Court's grant of a temporary injunction. Its opinion was designated as unpublished. *Lumbar v. Welsh*, 2007 WL 1531971. The Court of Appeals held that the trial court had lacked authority to grant interim equitable relief to Daniel Lumbar before an "action" on the contract for deed had been commenced via the filing of a complaint "setting forth [his] causes of action and supporting facts." It also discussed "the underlying merits" of the grant of temporary injunction, "in the interests of fairness and equity." Ultimately, it opined that "the relevant admissible facts [did] not support a reasonable probability of success on [Daniel Lumbar's] oral-modification-of-contract claim." (This undercut Daniel Lumbar's alternate argument against the threshold event of default that enabled cancellation.) It also expressed doubt as to the legal sustainability of his claim against the Welshes for intentional interference with contractual relationships, i.e., that based on their communication to the title company. But ultimately, the Court of Appeals observed how the lapse of time under an ongoing stay of cancellation and the intervening filing of a complaint had made "the procedural posture ... unique." It remanded after reversing the grant of the temporary injunction. Observing that "the circumstances may have changed," the Court of Appeals suggested that the trial court might "choose to review the motion for temporary injunction and conduct an evidentiary hearing in light of the complaint."

19. After the remand, a motion for dismissal by the defendants was heard in the state trial court in mid-July, 2007. In an order entered on October 8, 2007, the state-court judge denied the motion. He held that Daniel Lumbar had pled facts sufficient to make out claims against the defendants under all 8 counts of his complaint. As an additional dispositive term of that order (but without any extended discussion in his memorandum), he directed that "[t]he cancellation of the contract [was] stayed and [Daniel Lumbar was] stayed from redeeming until this matter [was] adjudicated."

20. On November 7, 2007, the Welshes and the Lumbars executed a settlement and release agreement, pursuant to which the Ramsey County District Court litigation was to be dismissed. Under the relevant terms of the settlement,

a. Raymond Welsh was to pay Daniel Lumbar a total of $85,000.00;

b. Daniel Lumbar was to "execute a quit claim deed to the property in favor of" the Welshes, as was the Debtor; and

c. Daniel Lumbar and the Debtor agreed "with regard to the . . . issues arising out of their dissolution action," that "all marital property shall be solely owned by" the Debtor.

21. On November 16, 2007, the Debtor executed a quit claim deed of her interest in the Wellesley Avenue property, in favor of the Welshes. On its face, the deed recites that the "total consideration for this transfer [was] $500 or less."

22. A stipulation of dismissal was filed in the Ramsey County District Court on January 7, 2008. The state-court judge signed the appended order of dismissal with prejudice on the same date.

23. The quit claim deed from the Debtor had not been filed in the Ramsey County land records by the date of the Debtor's bankruptcy filing on December 24, 2008.

24. When the Debtor filed for bankruptcy, she did not schedule an interest in the property as an asset.

25. At all relevant times, the Wellesley Avenue property was not subject to the encumbrance of a mortgage in favor of any third party.

26. When the complaint and answer in this adversary proceeding were filed in mid–2009, the Debtor was still residing at the property.

### DISCUSSION [3]

In some respects, one can see why the Trustee chose to bring her avoidance powers to bear on the Defendants' acts with respect to the Wellesley Avenue property. There is much that smacks of a "family thing" born of blood loyalty—a blunt effort to ice out Daniel Lumbar, to cut him off from any claim to the value of the property. The fact that Joan Welsh's family had generations-deep ties to the real estate only reinforces the image. The Welshes' failure to place the post-cancellation disposition of the property of record puts a surreptitious tinge on the whole process and its outcome. And, the picture of an orchestrated ploy to favor the family alone was strengthened by the bare legal outcome of the events: the Welshes had regained the power to revest the title and ownership in the Debtor, their daughter, after any intervening unpleasantness with third parties had receded.

But such an *appearance* alone can not direct the outcome of the Plaintiff's effort. That will turn on whether the component transfers are vulnerable to avoidance at the instance of a creditor or trustee in bankruptcy. This is a matter of the law's abstractions. Under most varieties of that abstraction, the naked self-interestedness of the acts and transfer is not relevant.

That much being said, the counts before the Court can be treated on the competing analyses argued by the parties. The discussion will be ordered by the relative viability of the several counts, in the legal sense, starting with the least viable.

I. Count IV: Avoidance as Constructively–Fraudulent Transfer Under Minnesota State Law [11 U.S.C. § 544 and Minn.Stat. §§ 513.44–513.45]

■ 11 U.S.C. § 544 enables a trustee in bankruptcy to use certain powers under

---

**3.** This section incorporates conclusions of law, memorialized in a narrative-oriented format. It also contains additional findings of fact, specific to the analysis of given counts of the Plaintiff's complaint.

applicable state law to avoid pre-petition fraudulent transfers of property of the debtor. *E.g., In re Popkin & Stern*, 223 F.3d 764, 769 n. 11 (8th Cir.2000); *In re Graven*, 64 F.3d 453, 456 (8th Cir.1995); *In re Graven*, 936 F.2d 378, 383 n. 7 (8th Cir.1991). In Count IV of her complaint, the Plaintiff uses § 544 to invoke the constructive-fraud provisions of Minnesota's enactment of the Uniform Fraudulent Transfer Act, Minn. Stat. §§ 513.44 and 513.45, to seek avoidance of any transfer that was effected when the Debtor gave the quit claim deed to the Defendants.

In defense, the Defendants argue that they effected and completed a cancellation of the Debtor's interest as purchaser under the contract for deed, pursuant to the stipulation in the state-court litigation, and that revested them with the full interest in the real estate in any case. Were this so, the earlier tender of the quit claim deed would arguably be irrelevant, mere surplusage, if viewed in the broader context of the stipulation and its consequences.

This argument, however, does not go to the act that the Plaintiff posits as the actionable transfer, in seeking summary judgment now: the tender of the quit claim deed, and that act alone.[4] The Defendants' alternate theory on this count is the one to be addressed. It goes to the threshold availability of fraudulent transfer remedies under Minnesota law, as to any voluntary transfer of the specific interest in the Wellesley Avenue property that the Debtor held. The alternate theory goes to a deeper level of the parties' contest; and under long-standing Minnesota precedent that is still valid, it is dispositive.

Simply stated, under Minnesota law, remedies of avoidance under fraudulent-conveyance and fraudulent-transfer statutes do not lie, as to a transfer of an interest in real estate that is exemptible from claims of creditors as homestead. The underlying legal tenet was first enunciated over 130 years ago. *Morrison v. Abbott*, 27 Minn. 116, 6 N.W. 455, 455–456 (1880). *See also Ferguson v. Kumler*, 27 Minn. 156, 6 N.W. 618, 620 (1880); *Thysell v. McDonald*, 134 Minn. 400, 159 N.W. 958, 960 (1916); *Cysewski v. Steingraber*, 222 Minn. 221, 24 N.W.2d 266, 269 (1946); *State Bank in Eden Valley v. Euerle Farms, Inc.*, 441 N.W.2d 121, 125 (Minn. Ct.App.1989). The most commonly quoted articulation is itself over 60 years old:

> Exempt property is not susceptible of fraudulent alienation, and creditors ordinarily have no right to complain of the disposition made of it, since they cannot be prejudiced thereby or claim that it is a fraud upon them. So far as exempt property is concerned, there are no creditors within the meaning of the [fraudulent transfer] statute.

*Sisco v. Paulson*, 232 Minn. 250, 45 N.W.2d 385, 387 (1950).

This holding derives not only from the basic protection from claims of general unsecured creditors or judgment lienors that Minn.Stat. §§ 510.01–510.02 afford to an interest in real estate used as a dwelling place. It also springs from the additional protection that Minn.Stat. § 510.07 grants to "the proceeds of ... sale [of homestead real estate] for the period of one year after sale," from seizure by the holder of "any judgment or debt from which [such real estate] was exempt in the owner's hands." The connecting thought is summarized later in *Sisco v. Paulson:*

---

4. In actuality, if the tender of the quit claim deed was effective as a transfer and is legally unassailable, the notion of a later cancellation is irrelevant. If it tracks that way, this argument would be no more than a diversion.

The grantee of the homestead property acquires the title to the property exempt or immune from the claims of grantor's creditors. If such claims could not have been asserted against the property while the title remained in the grantor, they may not be enforced against the grantee.

*Id.*

In this adversary proceeding, the Plaintiff's power of avoidance is governed by the Minnesota law she invokes for the substantive basis of her remedy.[5] Outside of bankruptcy, any creditor in these classes would be barred from avoiding a transfer by the Debtor of any interest she had held in the Wellesley Avenue property. Both sides' fallback position on the ownership issue is that the Debtor held at least an undivided one-half of a purchaser's interest under a contract for deed, when she gave the quit claim deed to the Welshes.[6] It is undisputed that she occupied it as her dwelling place at that time.[7]

Those circumstances of ownership and use supported the statutory protection for the real estate as her exempt homestead as of the relevant time. This in turn immunized her transfer of it from avoidance as a fraudulent transfer under state law.

In rejoinder, the Plaintiff argues that 11 U.S.C. § 522(g) should be applied to bar the use of a theory of homestead exemption to her bid for avoidance. Under that statute, a debtor in bankruptcy may assert a right of exemption as to property that would be subject to post-avoidance recovery by a trustee, but only where the pre-bankruptcy transfer of the property had been involuntary. So, as the Plaintiff would have it, the preemptive assertion of an exemption right is not available to any party here, because the Debtor voluntarily deeded the real estate to the Defendants.

■ The Plaintiff's threshold point cannot be denied, as to the limiting effect of

---

5. The bankruptcy law empowering her gives her the standing of the holder of a judgment lien, 11 U.S.C. § 544(a)(1), the holder of an unsatisfied execution on a judgment, 11 U.S.C. § 544(a)(2), or an unsecured creditor holding a claim sufficiently founded in fact and law to be allowable in bankruptcy, 11 U.S.C. § 544(b)(1).

6. The Defendants' first-line position on the ownership issue is that the Debtor's purchaser's interest was extinguished in any event on November 26, 2007, by cancellation under color of the notice they served in May, 2006. Under this theory, the cancellation would have been accomplished by operation of Minn.Stat. § 559.21, on the Debtor's concession to the Welshes and 15 days after the parties' agreement to dismiss the lawsuit. (The concession was that the Debtor had "no right to cure the default under the contract for deed or redeem the property." It is memorialized in those words, in the stipulation in the lawsuit. The record does not seem to bear out the assertion that the long-pending notice of cancellation was to ripen to an actual termination of the Debtor's rights at any

stipulated date; one cannot find a proviso to that effect anywhere.) The Plaintiff denies that the terms of the settlement can be given this additional, self-executing legal consequence to restore the real estate to the Welshes, i.e., cumulative to the Debtor's covenant to give the quit claim deed. Ultimately, this argument can be conceded to the Plaintiff, at least in the hypothetical. But though this concession preserves the Plaintiff's reliance on the quit claim deed as an effective transfer of property rights, it does not avail her in the end. *Fundamental state law still bars the Plaintiff from invoking the avoidance remedy.*

7. The Debtor stated as much, in an affidavit submitted by the Defendants. [Dkt. No. 21, ¶ 3.] The Plaintiff acknowledged a continuity of occupancy by the Debtor, in her complaint [¶ 36] and in the initial memorandum for her motion for summary judgment [p. 8, ¶ 33]. Since the Plaintiff did not produce evidence to rebut the Debtor's more explicit statement, this acknowledgment has to be taken as a concession on the ultimate point of fact—the occupancy on the relevant, intermediate date.

11 U.S.C. § 522(g)(1)(A) *in context.*[8] But, the negative implication of § 522(g)(1)(A) only prohibits a debtor from *newly* claiming an exemption to property that has *already* been subjected to avoidance at a trustee's instance.[9] The Plaintiff's reliance on this statute reverses the proper application of homestead concepts to the analysis that these facts require. State law is more fundamental; and it simply bars the Plaintiff from obtaining avoidance in the first place.[10] Any consideration of the Debtor *now* claiming an exemption is immaterial.[11] The fact that the bar stems from the pre-transfer status of the property as exempt does not trigger § 522(g)(1)(A), in this context.

Under the governing substantive law, the Plaintiff lacks a remedy under this count. She is not entitled to judgment on Count IV, and the Defendants are.

II. Count V: Avoidance as Unperfected Transfer Under Minnesota State Law [11 U.S.C. § 544(a)(3) and Minn.Stat. § 507.34]

■ 11 U.S.C. § 544(a)(3) vests a trustee in bankruptcy with the power to "avoid any transfer of property of the debtor ... that is voidable by ... a bona fide purchaser of real property, ... whether or not such a purchaser exists." The existence and scope of this avoidance power is also fixed by applicable state law. *In re Rolain,* 823 F.2d 198, 199 (8th Cir.1987); *In re Ozark Rest. Equip. Co., Inc.,* 816 F.2d 1222, 1229 (8th Cir.1987); *In re Griffin,* 319 B.R. 609, 613 (8th Cir. BAP 2005); *In*

---

**8.** For that proposition, Plaintiff properly cites *In re Arzt,* 252 B.R. 138 (8th Cir. BAP 2000) and *In re Trujillo,* 215 B.R. 200 (9th Cir. BAP 1997). *See also In re Sutton,* 365 B.R. 900 (8th Cir. BAP 2007) and *In re Flitter,* 181 B.R. 938 (Bankr.D.Minn.1995).

**9.** The underlying thought is that a debtor ought not to be able to undo his past, *voluntary* transfer toward his own benefit, after the trustee has done the work of avoidance.

**10.** This conclusion is the only one possible from the phraseology of *Sisco v. Paulson* that "[e]xempt property *is not susceptible of* fraudulent alienation...." 45 N.W.2d at 387 (emphasis added).

**11.** The Plaintiff appears to rely on *In re Trujillo* for the rationale through which she would have § 522(g) applied to defeat the Defendants' defense to avoidance. In *Trujillo,* the debtors had "contend[ed] there can be no fraudulent conveyance of exempt property," to counter a trustee's effort to avoid transfers of vehicles and real estate title to their children. 215 B.R. at 205. The opinion in *Trujillo* identifies the basis of their argument vaguely, as being founded on "Nevada's version [of] the Uniform Fraudulent Transfer Act"; the text does not quote the debtors as relying on specific sections of the statute or on any judicial application to the specific

situation in question. *Id.* The *Trujillo* panel summarily rejected the argument, on the ground that the debtors there "were no longer entitled to the exemption" because they "had voluntarily transferred their property...." *Id.* (citing *In re Noblit,* 72 F.3d 757 (9th Cir.1995) for proposition that "[i]f exempt property is transferred, the debtor has, in essence, waived the exemption"). *Noblit* and *Trujillo* are *not* based on a notion that § 522(g)'s negative implication federally preempts state law that would bar a bankruptcy trustee from using § 544 to avoid a debtor's transfer of property claimable as exempt. Rather, in *Noblit* the Ninth Circuit rejected a "no harm, no foul" shunt around avoidance remedies, which some courts had recognized as an extension of the judicially-imposed "diminution of the estate" prerequisite for imposition of avoidance remedies at a trustee's behest in a bankruptcy case. 72 F.3d at 758–759. Obviously, this analysis is conducted at the federal statutory level. To be sure, *Trujillo* may be based on a judicial recognition that Nevada law simply lacked a pronouncement on this specific issue, and absent such the bankruptcy-specific policy prevailed. It is just not possible to tell from the terse wording of the panel's treatment. Whichever *Trujillo*'s basis, the decision has no vitality here; governing state law directly speaks to the substratum issue, the availability of an avoidance remedy to any creditor in the first place.

re Marlar, 252 B.R. 743, 752 (8th Cir. BAP 2000), aff'd on other grounds, 267 F.3d 749 (8th Cir.2001); In re Strom, 97 B.R. 532, 536 (Bankr.D.Minn.1989); In re Inv. Sales Diversified, Inc., 38 B.R. 446, 453 (Bankr. D.Minn.1984). Cf., Smith v. Mark Twain Nat'l Bank, 805 F.2d 278, 284 (8th Cir. 1986) (extent of trustee's "strongarm" powers under 11 U.S.C. § 544(a)(1) is "measured by the substantive law of the jurisdiction governing the property in question").

In Count V of her complaint, the Plaintiff uses this provision to invoke the provisions of Minn.Stat. § 507.34, part of the state's Recording Act, which provides as follows:

> Every conveyance of real estate shall be recorded in the office of the county recorder of the county where such real estate is situated; and every such conveyance not so recorded shall be void as against any subsequent purchaser in good faith and for a valuable consideration of the same real estate, or any part thereof, whose conveyance is first duly recorded....

She points out that the quit claim deed in question was never filed in the land records for Ramsey County. That, she argues, makes any conveyance effected by the instrument void as to her; and therefore any transfer as between the Debtor and the Defendants must be avoided so as to vest the underlying interest in the bankruptcy estate by operation of 11 U.S.C. § 551.[12]

This theory was treated in Sisco v. Paulson. In that case, the grantee of the judgment debtor's interest in her homestead did not record the deed until after the debtor-transferor's death. The judgment creditor in Sisco v. Paulson pointed out that the deed was not of record when the debtor's occupancy of the property as homestead ceased (i.e., upon her death); so, he argued, his judgment lien had attached at that time. Thus, he maintained, the conveyance of the property had to be void as to him and his lien, due to its unperfected status.[13]

The Minnesota Supreme Court rejected this analysis, holding:

> Such a theory, if valid, would defeat every conveyance of a homestead free of the lien of a prior judgment. Necessarily there must be a lapse of time between the execution of the deed and the recording of it. When the deed had been executed and delivered, the grantor of the homestead premises had no longer any title to the premises, irrespective of whether the deed was recorded or not. That, however, does not permit the prior judgment lien holder to step in and say that his judgment attaches. It is obvious that § 510.07, the homestead exemption statute, must qualify § 507.34, the recording statute. As stated, as far as exempt property is concerned, homestead or any other property, there are no creditors within the meaning of the statute. When the owner sells it or conveys it, it cannot be subjected to prior judgment debts.
>
> ....
>
> Whether [the judgment creditor here] had notice, actual or constructive, of the conveyance of the premises to [the judg-

---

**12.** In pertinent part, this statutes provides:

> Any transfer avoided under [11 U.S.C. §§ ] 544, [or] 548, ... is preserved for the benefit of the estate but only with respect to property of the estate.

**13.** The lack of recording in Sisco v. Paulson was not as redolent of fraudulent concealment as this abstract description might suggest. Less than three weeks elapsed between the judgment debtor's signature on the deed and its recording, with the death falling barely two weeks after the execution of the deed.

ment debtor] is wholly immaterial. The validity of the sale of exempt homestead property cannot be influenced by whether a prior judgment creditor of the grantor knew that a sale had been consummated.

45 N.W.2d at 387.

The facts at bar are not 100% on point, but the differences do not distinguish *Sisco v. Paulson* from this adversary proceeding. The fact that the Defendants did not have the quit claim deed recorded before the Debtor filed for bankruptcy does not render it vulnerable to avoidance at the Plaintiff's instance. The exempt status of the real estate when the Debtor conveyed it to the Defendants took its transfer out of the purview of the Recording Act, as to any person that otherwise would have a right to rely on the record status of title, i.e., a subsisting, partial interest of record in the Debtor, as a co-purchaser under a recorded contract for deed. Hence, the Plaintiff may not disregard the conveyance to compel avoidance in the estate's favor.[14]

The Plaintiff is not entitled to judgment on Count V either, and the Defendants are.

III. Count II: Avoidance as Constructively–Fraudulent Transfer Under Federal Bankruptcy Law [11 U.S.C. § 548(a)(1)(B) ]

■ 11 U.S.C. § 548(a)(1)(B) vests a trustee in bankruptcy with a second power to avoid pre-petition transfers of property of a debtor that are deemed constructively fraudulent on creditors. Its language is very similar to corollary constructive-fraud provisions of the UFTA.[15] The federally-

---

**14.** The continuing record presence of the contract for deed would certainly have been enough to put anyone on constructive notice as to the current status of rights claimed or claimable by both the sellers and the purchasers under that document. *Henschke v. Christian,* 228 Minn. 142, 36 N.W.2d 547, 550 (1949) (" 'One is not a bona fide purchaser and entitled to the protection of the recording act, ... if he had knowledge of facts which ought to have put him on an inquiry that would have led to a knowledge of such conveyance.' "); *Hentges v. P.H. Feely & Son, Inc.,* 436 N.W.2d 488 (Minn.Ct.App.1989). And, even though Minn.Stat. § 507.235 subd. 1 requires the prompt recording of all evidence of a transfer of a purchaser's interest under a recorded contract for deed, a seller's failure to do so does not vitiate the original constructive notice, and all it implied by way of an obligation to inquire about the current status of rights of the parties. Here, proper inquiry would have brought the true status of rights to light. (The *current* status of rights under a private financing vehicle like a contract for deed is surely an "additional fact[ ] as its language directs attention to," as implicated by constructive notice under *Niles v. Cooper,* 98 Minn. 39, 42, 107 N.W. 744, 745 (1906).) Given the specific transfer at issue here—quit claim from purchaser back to seller—these considerations deprive the Plaintiff of any aggrieved status she would otherwise assert under 11 U.S.C. § 544(a)(3).

**15.** In pertinent part, § 548(a)(1)(B) provides:

(a)(1) The trustee may avoid any transfer ... of an interest of the debtor in property, ... that was made ... on or within 2 years before the date of the filing of the [bankruptcy] petition, if the debtor voluntarily or involuntarily—

....

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made ..., or became insolvent as a result of such transfer ...;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; ....

....

By comparison, Minn.Stat. § 513.44(a)(2) provides:

(a) A transfer made ... by a debtor is fraudulent as to a creditor, whether the

created avoidance power applies only to "an interest of the debtor in property." 11 U.S.C. § 548(a)(1). In bankruptcy cases, state law defines and delimits property interests; there is no separate "federal law" that redefines property interests for treatment under the Bankruptcy Code. *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007) (" '[p]roperty interests are created and defined by state law,' and '[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.' "); *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

■ Thus, the precept in Minnesota law—that exempt homestead real estate is not capable of fraudulent transfer such as to trigger statutory avoidance remedies—extends to the federally-created remedy of § 548(a)(1). *E.g., In re Agnew*, 818 F.2d 1284, 1289–1290 (7th Cir.1987) (holding that state law prohibiting recognition of fraudulent conveyance of otherwise-exempt property bars creditor from maintaining adversary proceeding for denial of

> creditor's claim arose before or after the transfer was made ..., if the debtor made the transfer ...:
>
> . . . .
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer ..., and the debtor:
> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

16. There seems to be some disagreement in the published decisions as to whether state law must contain an explicit bar to the appli-

discharge under 11 U.S.C. § 727(a)(2), when sole cited transfer was of exemptible property); *In re Delson*, 247 B.R. 873, 875–876 (Bankr.S.D.Fla.2000) (applying Florida law and summarizing past decisions limiting application of § 548 in consequence); *In re Robinett*, 47 B.R. 591, 592 (Bankr.S.D.Fla.1985) (applying Florida law; citing *In re Treadwell*, 699 F.2d 1050, 1051 (11th Cir.1983)).[16]

The Plaintiff has no independent fraudulent transfer remedy against the Defendants under § 548 either. The Defendants are entitled to judgment on Count II.

IV. Count III: Avoidance as Actually–Fraudulent Transfer Under Federal Bankruptcy Law [11 U.S.C. § 548(a)(1)(A) ]

11 U.S.C. § 548(a)(1)(A) gives a trustee in bankruptcy the power to

> avoid any transfer ... of an interest of the debtor in property ..., if the debtor voluntarily or involuntarily—... made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, ... indebted....

cation of fraudulent-transfer remedies to conveyances of exemptible property, before a trustee's action under § 548 is prohibited. *Compare In re Trujillo*, 215 B.R. at 204–205 (rejecting argument that cited "Nevada's version [of] the Uniform Fraudulent Transfer Act ... for the allegation that a transfer of exempt property cannot be a fraudulent conveyance"; though discussion silent as to whether Nevada law featured or lacked any extrinsic on-point holding in case law or on-point prohibition in statute), *with In re Weis*, 92 B.R. 816, 822–823 (Bankr.W.D.Wis.1988) (extending analysis of *Agnew* to trustee's action under § 548, without citing extrinsic Wisconsin state-law authority for a bar). But that is of no moment here, given the numerous and strong pronouncements of the Minnesota appellate courts.

Under Count III of her complaint, the Plaintiff impugned the Debtor's transfer of the Wellesley Avenue property as one "made with the actual intent to hinder, delay or defraud creditors," and she sought to avoid it under this provision.[17] For this motion, the Plaintiff first had to establish that there was no genuine issue of material fact as to this count. She premised her argument for this first requirement on the following assertion, and this assertion only:

> Raymond and Joan Welsh accepted the Vendee's Interest [under the contract for deed] with the knowledge of the [sic] their daughter's intent to hinder, delay and defraud creditors under 11 U.S.C. § 548(a)(1)(A). In fact, the records [sic] indicates that Defendants were integrally involved in a scheme which initially was intended to deprive Daniel Lumbar of any equity in the Real Estate, but which ultimately resulted in a fraud on Mary Lumbar's creditors as well.

As the Plaintiff would have it, the record compels a finding of actual intent to remove "the asset which [the Defendants] attempted to shield from Daniel Lumbar's claims ... also ... from claims of [the Debtor's] other creditors."

The Plaintiff cites points of fact that are all circumstantial in nature: the positions of parties in relation to one another and the subject assets, over a span of time; the sequence of acts, events, and transactions in relation to the dissolution proceeding and the Debtor's bankruptcy filing; the transfer itself and all of its incidents; and so forth. These, she insists, cumulate as "badges of fraud" in an "overwhelming" fashion. As she would have it, there is only one reasonable finding, of the requisite malign intent, which would mandate summary judgment on Count III.[18]

The Defendants, of course, had a different spin on these scattered points of fact. It need not be recapitulated here; the Plaintiff's argument was so misdirected, and in so many ways, that it merited rejection from the bench. The Defendants were granted summary judgment on this count, at the hearing. The rationale was memorialized on the record. It is appropriate to expand on that a bit.

■ In the first place, the written articulation of the Plaintiff's theory all accused *the Defendants* of having actual fraudulent intent. The Plaintiff clearly sees the

---

17. In her briefing for this motion, the Plaintiff's counsel cited a portion of Minnesota's enactment of the UFTA, Minn.Stat. § 513.44(b), in addition to the originally-pleaded federal authority of § 548(a)(1)(A). She then built her briefed argument on case law construing the Minnesota statutory provisions. The organization of the Plaintiff's complaint, however, separates the counts by distinct legal characterizations of the transfer as avoidable. That impugning the transfer as actually-fraudulent, Count III, cites § 548(a), but only that statute. Counsel included a general reference to Minn.Stat. § 513.44 in Count IV; but the fact averments in that count are limited to the theory of a *constructively-fraudulent* transfer. Count III does not contain a specific citation to Minn.Stat. §§ 513.44–.45; nor does it have any factual allegation of actual fraudulent intent on the

Debtor's part that is linked to Minnesota law. A bid for avoidance as an actually-fraudulent transfer under Minnesota law cannot be winkled out of that content. The Plaintiff must be limited to the theories of recovery—factual and legal—as they are pleaded in her complaint.

18. As the Plaintiff's counsel pointed out, the UFTA—at Minn.Stat. § 513.44(b)—contains a non-exclusive list of factors that may be considered on the issue of actual fraudulent intent. Section 548 lacks such language for its actual-fraud provision; but judicial construction recognizes such "badges of fraud" as tools for fact-finding under it. *See,* for example, *In re Sherman,* 67 F.3d 1348, 1354 (8th Cir.1995); *In re Wilmoth,* 397 B.R. 915, 919 (8th Cir. BAP 2008).

Debtor's parents as Svengali-like manipulators, of the Debtor herself and an asset they were determined to control. Whether this is accurate is really not relevant; the question is *the Debtor's* goal, intent, and awareness, as the relevant actor who effected a transfer of property. Under § 548(a)(1)(A), the intent of the *transferor*, i.e., the debtor that later goes into bankruptcy without ownership of the asset, *in relation to that debtor's creditors*, is the element of scienter that must be proven. *In re McLaren*, 236 B.R. 882, 899 (Bankr. D.N.D.1999) (quoting *In re Bob's Sea Ray Boats, Inc.*, 144 B.R. 451, 458 (Bankr. D.N.D.1992)). The Plaintiff does not orient her theory of fact around that person's consciousness at all.

█ Beyond that, the record presented—as abstract and externally-oriented as it was—simply does not support a finding as to what the Debtor herself intended in relation to the real estate, or how her retention or relinquishment of it would bear on the interests of her creditors.

The Plaintiff proffers the following allegations of fact as her "badges":

1. The Welshes had a dual status as recipients of the transfer and as "insiders" to the Debtor, within the meaning of 11 U.S.C. § 101(31)(A)(i).

2. The Debtor continued to occupy the real estate after she gave the deed to the Welshes, and through the course of this litigation.

3. The Debtor retained "equitable title to the real estate," because the Defendants had never completed or perfected a cancellation of her purchaser's interest.

4. The Debtor had attempted a "concealment" of the relevant events and circumstances. However, the only cited act of concealment was the one-word description of the terms of settlement of the state-court litigation as "confidential," in the statement of financial affairs for the Debtor's bankruptcy case.

5. The Defendants' receipt of the quit claim deed was related (in some unspecified sense) to the past acts of the Debtor and the Defendants in "attempting to shield the equity in the real estate from claims of Daniel Lumbar in the dissolution proceedings."

6. The value of the Debtor's interest as purchaser, stated as $170,000.00, was the Debtor's "only significant unencumbered asset."

7. The Debtor received no reasonably equivalent value for giving the quit claim deed to the Defendants.

8. When she gave the deed, the Debtor was insolvent, in the sense that her "liabilities exceeded her non-exempt assets."

As ruled at the hearing, these scattered abstractions of placement and sequence did not ignite in common, to expose a debtor purposely depriving her own creditors of the value of a non-exempt asset. They did not even smolder. There was no direct evidence going to the Debtor's intent at all. There was nothing in the array of scattered surrounding circumstances, on which to conclude that the Debtor was even considering the interests of her creditors when she gave the deed, some months before the eventuality of her bankruptcy filing.

█ To mix the metaphor, proof of intent under a badges-of-fraud analysis is not like a carnival dart game, where simply popping a given number of balloons entitles one to the big prize. Yet that is the image that best matches to the Plaintiff's approach on this count, for this motion. The fatal problem with the Plaintiff's presentation is that there is no overriding logical sense of an intentional scheme *directed at the Debtor's creditors*, that culmi-

nated in the passage of the quit claim deed. Had the Debtor retained the purchaser's interest, her creditors could not have seized it in bankruptcy or out of it; so how could the abstract fact of transfer evidence an intent on her part to unfairly deprive them of something?

In coming forward on a motion under Rule 56, the Plaintiff was deemed to be taking her very best shot at a case-in-chief, the same one she would bring forward at trial through equivalent live evidence. The showing she relied on was so deficient that it merited a doubly-summary treatment—not only an adverse determination as a matter of law, despite the fact that her opponents had not expressly requested that, but a terse rejection from the bench at hearing. The present discussion is cumulative to that memorialization. It all evidences why the Defendants are entitled to judgment on Count III.

### V. Form of Disposition of Matters at Bar

 Under these rulings, the Defendants are entitled to judgment on most of the counts of the Plaintiff's complaint.[19] However, the Plaintiff's motion did not address every last count still in suit; and the Defendants did not independently seek summary judgment as to the remainder. Under this posture, "the court may direct entry of a final judgment as to ... fewer than all, claims [raised by the Plaintiff in her complaint] only if the court expressly determines that there is no just reason for delay." Fed.R.Civ.P. 54(b), *as incorporated by* Fed. R. Bankr.P. 7054. The Eighth Circuit disfavors making this certification on a posture of litigation like the one at bar. *E.g., Clos v. Corrections Corp. of America,* 597 F.3d 925, 928 (8th Cir.2010);

*Clark v. Baka,* 593 F.3d 712, 715 (8th Cir.2010); *Taco John's of Huron, Inc. v. Bix Produce Co., LLC,* 569 F.3d 401, 402 (8th Cir.2009). The reason is the strong judicial policy to avoid the conditions for piecemeal appeals. *Interstate Power Co. v. Kansas City Power & Light Co.,* 992 F.2d 804, 806–807 (8th Cir.1993); *Hardie v. Cotter and Co.,* 819 F.2d 181, 182 (8th Cir.1987). *See also In re Hicks,* 369 B.R. 420, 422–423 (8th Cir. BAP 2007); *In re Strong,* 293 B.R. 764, 767–768 (8th Cir. BAP 2003).

Thus, the parties will have to litigate—or consensually dismiss—the Plaintiff's remaining requests for relief before judgment may be entered on the present rulings.

IT IS THEREFORE ADJUDGED AND ORDERED:

1. The Plaintiff's motion for summary judgment is denied, in its entirety.

2. The Defendants are entitled to summary judgment in their favor, on Counts II–V of the Plaintiff's complaint, in accordance with Terms 3–5 as follows.

3. The remedy of avoidance as a fraudulent transfer under 11 U.S.C. §§ 544 and 548(a) and Minn.Stat. §§ 513.44–.45 is not available to the Plaintiff as a trustee in bankruptcy, as to any transfer that the Debtor made to the Defendants of her interest as purchaser under a contract for deed for the property located at 1866 Wellesley Avenue, St. Paul, Ramsey County, Minnesota, via the execution and tender of a quit claim deed dated November 16, 2007.

4. The remedy of avoidance under 11 U.S.C. § 544 and the Minnesota law gov-

---

**19.** None of the discussion addresses the implications of the naming of the Welshes as grantees under the quit claim deed, rather than the Welsh Trust in which the seller's interest reposed of record. Given the outcome on more basic issues, it was not necessary to reach that one.

erning unperfected transfers of interests in real estate is not available to the Plaintiff as a trustee in bankruptcy, as to any transfer that the Debtor made to the Defendants of her interest as purchaser under a contract for deed for the property located at 1866 Wellesley Avenue, St. Paul, Ramsey County, Minnesota, via the execution and tender of a quit claim deed dated November 16, 2007.

5. Hence, the Plaintiff is not entitled to avoid any such transfer to the Defendants, or to recover the value of the subject property from the Defendants.

6. The entry of a judgment on Terms 3–5 shall be deferred, pending final disposition of the Plaintiff's requests for relief under all other counts of her complaint.